OFFICE OF DISCIPLINARY COUNSEL *v.* GARDNER.

[Cite as *Disciplinary Counsel v. Gardner,*
99 Ohio St.3d 416, 2003-Ohio-4048.]

(No. 2002–1461—Submitted January 8, 2003—Decided August 13, 2003.)

---

**Per Curiam.**

{¶ 1} Respondent, Mark J. Gardner of Cleveland, Ohio, Attorney Registration No. 0061172, was admitted to the practice of law in Ohio in May 1993. On August 13, 2001, relator, Disciplinary Counsel, filed a complaint charging respondent with several violations of the Code of Professional Responsibility, including DR 7–106(C)(6) (engaging in undignified or discourteous conduct which is degrading to a tribunal) and 8–102(B) (knowingly making a false accusation about a judge). A panel of the Board of Commissioners on Grievances and Discipline heard the matter and, based on stipulations and respondent's testimony, made findings of fact and conclusions of law and recommended a sanction.

{¶ 2} The record establishes that in 2001, respondent appealed to the Court of Appeals for the Eighth District on behalf of a client convicted of driving under a court-ordered license suspension. Respondent challenged the conviction as a denial of due process, arguing that his client had not received sufficient notice of the crime with which he had been charged. Respondent essentially acknowledged that his client was guilty of driving in violation of a court order; however, he maintained that the police officer had mistakenly charged his client with driving in violation of Ohio's Financial Responsibility Act ("FRA"), a crime of which his client was not guilty. The court of appeals affirmed the conviction.[1]

---

1. During the trial and appeal, respondent emphasized that the crimes of driving under a court-ordered license suspension and driving under an FRA license suspension were different subsections of the general ordinance prohibiting driving under suspension. He argued that his client had actually been charged with the "wrong" crime because the charging officer had identified only the general ordinance on the client's ticket, the officer had described the suspension as "FRA," and the officer's trial testimony suggested that he had intended to charge the client with an FRA

{¶ 3} In a motion seeking reconsideration or, in the alternative, certification of the case as a conflict to this court, respondent accused the panel that decided his client's appeal of being dishonest and ignoring well-established law. He declared that the panel had issued an opinion so "result driven" that "any fair-minded judge" would have been "ashamed to attach his/her name" to it. He then added that the panel did not give "a damn about how wrong, disingenuous, and biased its opinion is."

{¶ 4} Throughout the several pages that followed, respondent inveighed against the panel, contrasting it with "fair-minded Ohio appellate districts" and stating that "[n]o matter how bad [the] panel wants to skew or ignore the facts," it could only conclude that his client had been improperly charged. He lamented that "honesty and truth [were] damned" in the panel's opinion and that the panel's "desire to be 'tough on crime' [had] blind[ed] it to basic law and fairness." Respondent then posed these questions: "Why does this panel only apply the law as a hammer to crush citizens and not as a shield to protect their basic rights?" and "Is having a prosecutorial bent [so] hard to let go of that truth must be cast aside to achieve a particular result?"

{¶ 5} Respondent went on to accuse the panel of having "distorted the truth" and having "manufactured a gross and malicious distortion." His discussion continued:

{¶ 6} "Wouldn't it be nice if this panel had the basic decency and honesty to write and acknowledge these simple unquestionable truths in its opinion? Would writing an opinion that actually reflected the truth be that hard? Must this panel's desire to achieve a particular result upholding a wrongful conviction of a man who was unquestionably guilty of an uncharged offense—necessarily justify its own corruption of the law and truth? Doesn't an oath to uphold and follow the law mean anything to this panel?

{¶ 7} "Is that claim that 'We are a nation of laws, not men' have any meaning after reading the panel's decision? Can't this panel have the decency to actually address—rather than to ignore—the cases cited by [the client] which demonstrate beyond any doubt that he was convicted of an offense he was never charged with having violated?

{¶ 8} "In this case, beyond the ignored concepts of the law and truth, lies that of policy. As a policy matter, is this court really encouraging all officers in the

---

suspension violation. On the authority of *Barberton v. O'Connor* (1985), 17 Ohio St.3d 218, 17 OBR 452, 478 N.E.2d 803, paragraph two of the syllabus, the court of appeals held that the client was sufficiently charged because the general ordinance noted on the ticket allowed the client with "reasonable inquiry" to know exactly the charge against him. *Lakewood v. Cirino* (Feb. 1, 2001), Cuyahoga App. No. 78057, 2001 WL 91225, appeal not allowed (2001), 92 Ohio St.3d 1414, 748 N.E.2d 547.

Eighth District to charge a generic statute—or Chapter or Title—and not the particular offense they are accusing a citizen of violating? In the name of God, WHY? What is so difficult with a police officer doing his job in an intelligent manner? Why must this panel bend over backwards and ignore well established law just to encourage law officers to be slovenly and careless? In *State v. Homan* (2000), 89 Ohio St.3d 421 [732 N.E.2d 952], didn't the Ohio Supreme Court just state that officers actually have to follow the rules strictly? Doesn't that mean anything to this panel?

{¶ 9} "Perhaps, if this panel is not strong enough to admit its obvious prosecutorial bias in its opinion, it will discover the internal fortitude to certify this matter to the Ohio Supreme Court under Rule IV of the Rules of Practice of the Supreme Court of Ohio."

{¶ 10} The board's panel found, consistent with the parties' stipulation, that respondent had violated DR 7–106(C)(6). The panel also found respondent in violation of DR 8–102(B) by clear and convincing evidence.

{¶ 11} In recommending a sanction, the panel considered that respondent had no previous record of discipline and had apologized for the manner in which he expressed his frustration about the affirmance of his client's conviction. Respondent also recognized during the hearing that his response to the court of appeals' opinion was neither appropriate nor professional. However, while respondent professed to understand the need to challenge judicial decisions only in an appropriate manner, he confirmed his continued belief that the court of appeals during his client's appeal had skewed and ignored the facts, disregarded honesty and truth, and violated their oaths to decide cases fairly and impartially.

{¶ 12} The panel recommended the sanction suggested by the parties—that respondent be publicly reprimanded for the cited misconduct. The board adopted the findings that respondent violated DR 7–106(C)(6) and 8–102(B), but rejected the panel's sanction. The board recommended, based on his "outrageous behavior toward a tribunal," that respondent be suspended from the practice of law for a period of six months, with all six months stayed on the condition that he commit no further violations of the Disciplinary Rules.

{¶ 13} In objections to the board's finding that he violated DR 8–102(B) and its recommendation, respondent argues that his accusations are federally protected free speech because they are opinions and thus immune from disciplinary measures in the same way that mere opinions are not actionable in defamation. He also argues that even if his attacks were capable of being proved true or false, relator nevertheless failed to prove that respondent knowingly made "false" accusations for the purpose of DR 8–102(B). We review these arguments to determine whether respondent's statements, which specifically accuse the appel-

late court panel of prosecutorial bias and corrupting the law in order to sustain an unlawful conviction, may be disciplined as professional misconduct.

## The First Amendment

{¶ 14} The United States Supreme Court has held that "[i]t is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed. * * * Even outside the courtroom, a majority of the Court in two separate opinions in the case of *In re Sawyer*, 360 U.S. 622 [79 S.Ct. 1376, 3 L.Ed.2d 1473] (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be." *Gentile v. Nevada State Bar* (1991), 501 U.S. 1030, 1071, 111 S.Ct. 2720, 115 L.Ed.2d 888. See, also, *In re Disciplinary Action Against Garaas* (N.D.2002), 652 N.W.2d 918, 925. An attorney's speech may be sanctioned if it is highly likely to obstruct or prejudice the administration of justice. *Gentile* at 1075, 111 S.Ct. 2720, 115 L.Ed.2d 888. These narrow restrictions are justified by the integral role that attorneys play in the judicial system, which requires them to refrain from speech or conduct that may obstruct the fair administration of justice. Id. at 1074, 111 S.Ct. 2720, 115 L.Ed.2d 888.

{¶ 15} Thus, attorneys may not invoke the federal constitutional right of free speech to immunize themselves from even-handed discipline for proven unethical conduct. *In re Sawyer* (1959), 360 U.S. 622, 646, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (Stewart, J., concurring in result). The First Amendment does not shield an attorney from discipline for falsely suggesting "unseemly complicity" by the judiciary in unlawful or unethical practices. Id. at 633, 79 S.Ct. 1376, 3 L.Ed.2d 1473. Such false statements, whether by attorneys or others, enjoy no constitutional protection when they are made with knowledge of their falsity or reckless disregard for their truth. *Garrison v. Louisiana* (1964), 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125. Although neither *Sawyer* nor in *In re Snyder* (1985), 472 U.S. 634, 105 S.Ct. 2874, 86 L.Ed.2d 504, definitively so held, all of the justices who participated in those decisions assumed or stated that a lawyer's false accusations of criminal conduct directed against named judges could be the basis for discipline. *In re Palmisano* (C.A.7, 1995), 70 F.3d 483, 487. "Even a statement cast in the form of an opinion ('I think that Judge X is dishonest') implies a factual basis, and the lack of support for that implied factual assertion may be a proper basis for a penalty." Id. at 487, citing *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1. While *Milkovich* is a defamation case not involving attorney discipline, it demonstrates that the First Amendment does not protect any individual who knowingly makes false statements or expresses opinions that imply false statements of fact. *In re Complaint Against Harper* (1996), 77 Ohio St.3d 211, 673 N.E.2d 1253.

{¶ 16} Thus, the First Amendment does not insulate an attorney from professional discipline even for expressing an opinion, during court proceedings, that a judge is corrupt when the attorney knows that the opinion has no factual basis or is reckless in that regard. Respondent's contention that his statements are protected as unverifiable opinions is incorrect. *Milkovich* rejected the premise that the First Amendment mandates an inquiry into whether a statement is one of opinion or of fact. Id. at 18–19, 110 S.Ct. 2695, 111 L.Ed.2d 1. Accordingly, the United States Constitution offers respondent no protection.

### Section 11, Article I, Ohio Constitution

{¶ 17} This court has never addressed the question of whether the Free Speech Clause of the Ohio Constitution, Section 11, Article I, forbids imposing discipline on an attorney for criticizing a judge during a pending court proceeding. DR 8–102(B) specifically permits such discipline where a lawyer knowingly makes a false accusation against a judge. Section 11 states:

{¶ 18} "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech * * *."

{¶ 19} The tension between Section 11 and DR 8–102(B) lies at the heart of this case. Under Ohio law, speech that may violate DR 8–102(B) may be otherwise protected by the state Constitution. When the statement in question cannot reasonably be interpreted by the ordinary reader as stating actual facts about an individual, the statement is protected as the free expression of opinion under Section 11. *Harper*, 77 Ohio St.3d at 229, 673 N.E.2d 1253; *McKimm v. Ohio Elections Comm.* (2000), 89 Ohio St.3d 139, 144, 729 N.E.2d 364. Thus, the Ohio Constitution goes beyond the federal Constitution in that certain false statements of opinion are protected. This protection exists as a separate and independent guarantee ancillary to freedom of expression and requires a reviewing court to determine whether the language in question is fact or opinion. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182, certiorari denied (1996), 516 U.S. 1043, 116 S.Ct. 700, 133 L.Ed.2d 657; *Wampler v. Higgins* (2001), 93 Ohio St.3d 111, 117–118, 752 N.E.2d 962. The test for deciding whether a statement is fact or opinion is an objective one based on a totality of circumstances and on the specificity, verifiability, general context, and social context of the words used. Id. at 126, 752 N.E.2d 962; *McKimm*, 89 Ohio St.3d at 145, 729 N.E.2d 364.

{¶ 20} *In re Complaint Against Judge Harper*, 77 Ohio St.3d 211, 673 N.E.2d 1253, employed this distinction to publicly reprimand a judge for airing a campaign advertisement that falsely accused her judicial opponent of being associated with dishonest lawyers intent upon corrupting the legal system. Although the *Harper* court did not explicitly apply the totality-of-circumstances

test for distinguishing fact from opinion, the accusation in that case was sufficiently specific and weighed in favor of sanction. The advertisement in effect charged the judge's opponent with a crime—conspiring to fix cases.

{¶ 21} To accuse a court of appeals of affirming a conviction out of prosecutorial bias and corruption is no less specific. Such allegations are charges of criminal or unethical activity and, therefore, constitute classic examples of statements having a well-defined meaning. *Wampler,* 93 Ohio St.3d at 128, 752 N.E.2d 962, citing *Ollman v. Evans* (C.A.D.C.1984), 750 F.2d 970, 979–980. Accord *Standing Commt. on Discipline, U.S. Dist. Court, Cent. Dist. of Calif. v. Yagman* (C.A.9, 1995), 55 F.3d 1430, 1440 (statements that can reasonably be understood as imputing specific criminal or other wrongful acts are not entitled to constitutional protection merely because they are phrased in the form of an opinion). Allegations of criminal or ethical misconduct are also readily capable of being proved or disproved.

{¶ 22} Moreover, allegations of corruption made in documents filed in court, unlike allegations raised in a political campaign, are not what the average reader would reasonably consider to be an opinion. A courtroom is not a forum for personal or political grandstanding, and the attorneys who practice in it "possess, and are perceived by the public as possessing, special knowledge of the workings of the judicial branch of government." *State ex rel. Oklahoma Bar Assn. v. Porter* (Okla.1988), 766 P.2d 958, 969. Lawyers' statements made during court proceedings are "likely to be received as especially authoritative." *Gentile,* 501 U.S. at 1074, 111 S.Ct. 2720, 115 L.Ed.2d 888. Thus, in the context of his motion and that appeal, respondent's statements are reasonably understood to be factual assertions of the appellate court's corruption and prosecutorial bias.

{¶ 23} Accordingly, we reject respondent's contention that his attacks against the court of appeals represented any sort of "rhetorical hyperbole" or "imaginative expression" for which he might escape sanction. *Harper,* 77 Ohio St.3d at 229, 673 N.E.2d 1253, quoting *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695, 111 L.Ed.2d 1. Nor could respondent's accusations be " 'loosely definable' " or " 'variously interpretable' " as his criticism of the law as applied by the panel. *Wampler,* 93 Ohio St.3d at 128, 752 N.E.2d 962, quoting *Ollman,* 750 F.2d at 980. Accord *In re Sawyer,* 360 U.S. at 634, 79 S.Ct. 1376, 3 L.Ed.2d 1473. Respondent charged with "crystal clarity," *Wampler,* 93 Ohio St.3d at 129, 752 N.E.2d 962, that the panel's affirmation of his client's conviction resulted not from error, but from prosecutorial bias and corruption. For this offense against the integrity and impartiality of the court of appeals and the judicial system, he may be held responsible. *Harper,* 77 Ohio St.3d at 229, 673 N.E.2d 1253.

### Knowledge

{¶ 24} DR 8–102(B) provides that a lawyer "shall not knowingly make false accusations against a judge or other adjudicatory officer." Respondent claims

that this prohibition required relator to prove that his accusations of prosecutorial bias and corruption were false and that he subjectively knew that they were false. Relator urges us to apply an objective test.

{¶ 25} Respondent advocates the "actual malice" standard applicable in defamation cases under *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; *Bose Corp. v. Consumers Union of U.S., Inc.* (1984), 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502, fn. 30. At least three states have used the actual-malice standard in attorney discipline cases, that is, they have framed the issue as whether the lawyer uttered the statement with knowledge that the statement was false or with reckless disregard as to its truth. If no knowledge or recklessness is found, these courts have declined to discipline lawyers for accusing judges in public of bias. See *In re Green* (Colo.2000), 11 P.3d 1078, 1085; *Oklahoma Bar Assn. v. Porter*, 766 P.2d 958; *Ramsey v. Bd. of Professional Responsibility* (Tenn.1989), 771 S.W.2d 116, certiorari denied (1989), 493 U.S. 917, 110 S.Ct. 278, 107 L.Ed.2d 258. Similarly, in *Butler v. Alabama Judicial Inquiry Comm.* (Ala.2001), 802 So.2d 207, the court modified an overbroad judicial canon by incorporating the actual-malice test for judicial campaign speech.

{¶ 26} We, however, agree with the majority of courts that have addressed this issue and adopt "an objective standard to determine whether a lawyer's statement about a judicial officer is made with knowledge or reckless disregard of its falsity." Annotated Model Rules of Professional Conduct (4th Ed.1999) 566, Rule 8. This standard assesses an attorney's statements in terms of " 'what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances' * * * [and] focuses on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made." *Yagman*, 55 F.3d at 1437, quoting *United States Dist. Court, E. Dist. of Wash. v. Sandlin* (C.A.9, 1993), 12 F.3d 861, 867. Accord *In re Chmura* (2000), 461 Mich. 517, 608 N.W.2d 31; *In re Disciplinary Action Against Graham* (Minn.1990), 453 N.W.2d 313, 321–322, certiorari denied sub nom. *Graham v. Wernz* (1990), 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41; *In re Westfall* (Mo.1991), 808 S.W.2d 829, 837; and *In re Holtzman* (1991), 78 N.Y.2d 184, 192–193, 573 N.Y.S.2d 39, 577 N.E.2d 30, certiorari denied sub nom. *Holtzman v. Tenth Judicial Dist. Grievance Commt.* (1991), 502 U.S. 1009, 112 S.Ct. 648, 116 L.Ed.2d 665.

{¶ 27} "As the Court of Appeals of New York observed in *Holtzman, supra*, at 192, 573 N.Y.S.2d 39, 577 N.E.2d 30, adopting a subjective standard 'would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts as to their truth * * *.' The state's interest in protecting the public, the administration of

justice, and the legal profession supports applying a different standard in disciplinary proceedings." *Chmura,* 461 Mich. at 543, 608 N.W.2d 31, quoting *Sandlin,* 12 F.3d at 867.

{¶ 28} *Yagman,* 55 F.3d at 1437–1438, further explained why an "objective version" of the actual-malice test is permissible in the context of disciplinary proceedings:

{¶ 29} "[T]here are significant differences between the interests served by defamation law and those served by rules of professional ethics. Defamation actions seek to remedy an essentially private wrong by compensating individuals for harm caused to their reputation and standing in the community. Ethical rules that prohibit false statements impugning the integrity of judges, by contrast, are not designed to shield judges from unpleasant or offensive criticism, but to preserve public confidence in the fairness and impartiality of our system of justice. See *In re Terry,* 271 Ind. 499 [502], 394 N.E.2d 94, 95 (1979); *In re Graham,* 453 N.W.2d 313, 322 (Minn.1990).

{¶ 30} "Though attorneys can play an important role in exposing problems with the judicial system, *see Oklahoma ex rel. Oklahoma Bar Ass'n v. Porter,* 766 P.2d 958, 967 (Okla.1988), *false* statements impugning the integrity of a judge erode public confidence without serving to publicize problems that justifiably deserve attention. * * * [A]n objective malice standard strikes a constitutionally permissible balance between an attorney's right to criticize the judiciary and the public's interest in preserving confidence in the judicial system: Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken." (Emphasis added.)

{¶ 31} We similarly conclude that the state's compelling interest in preserving public confidence in the judiciary supports applying a standard in disciplinary proceedings different from that applicable in defamation cases. Under the objective standard, an attorney may still freely exercise free speech rights and make statements supported by a reasonable factual basis, even if the attorney turns out to be mistaken. Accord *In re Chmura,* 461 Mich. at 544, 608 N.W.2d 31. Accordingly, we hold that an attorney may be sanctioned for making accusations of judicial impropriety that a reasonable attorney would believe are false.

{¶ 32} Relator does not contest that it bore the burden of proof on this issue. Thus, we determine that a reasonable attorney would believe that respondent's accusations were false.

{¶ 33} Respondent obviously disagreed with the court of appeals' analysis and disposition of his client's appeal. But as relator aptly points out, he made no real inquiry into the court's integrity at all prior to launching his attacks, even ignoring his law partner's advice against making the accusations of bias and

corruption. A failure to investigate charges of judicial impropriety when EC 8–6 admonishes attorneys to "be certain" that their criticism has merit demonstrates reckless disregard for truth. This is particularly true where, as here, the attorney proceeds against the advice of a close colleague in whom he has previously shown confidence.

{¶ 34} Moreover, we have reviewed the court of appeals' opinion for evidence of bias and corruption and see nothing that could possibly be characterized as anything other than error, if that. Respondent simply assumed that the judges had conspired to defy their individual oaths to faithfully and impartially discharge the duties incumbent on their respective judicial offices to the best of their ability and understanding. R.C. 3.23. He thereby violated DR 8–102(B).

### Sanction

{¶ 35} We find respondent in violation of DR 7–106(C) and 8–102(B). We also find that his misconduct warrants a more serious sanction than that recommended by the board.

{¶ 36} Unfounded attacks against the integrity of the judiciary require an actual suspension from the practice of law. *Disciplinary Counsel v. West* (1999), 85 Ohio St.3d 5, 706 N.E.2d 760 (18–month suspension, 12 months stayed on conditions); *Columbus Bar Assn. v. Hartwell* (1988), 35 Ohio St.3d 258, 520 N.E.2d 226 (one-year suspension). Respondent is therefore suspended from the practice of law in Ohio for a period of six months. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, BOWMAN and O'CONNOR, JJ., concur.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

PFEIFER, J., dissents.

DONNA BOWMAN, J., of the Tenth Appellate District, sitting for COOK, J.

---

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 37} I concur with the majority's judgment and most of its analysis. However, I do not believe that Section 11, Article I of the Ohio Constitution and DR 8–102(B) are in conflict because I do not believe that the Ohio Constitution protects "false statements of opinion."

{¶ 38} The majority indicates that there is a conflict between DR 8–102(B) and Section 11, Article I of the Ohio Constitution because DR 8–102(B) prohibits "false accusations against a judge" while the Ohio Constitution protects "certain

false statements of opinion." I believe that the Ohio Constitution protects opinions but not false statements of opinion.

{¶ 39} In support of its position, the majority cites *In re Complaint Against Harper* (1996), 77 Ohio St.3d 211, 229, 673 N.E.2d 1253, and *McKimm v. Ohio Elections Comm.* (2000), 89 Ohio St.3d 139, 144, 729 N.E.2d 364. The cited portion of *McKimm* merely holds that alleged defamatory statements must be examined from a reasonable reader's perspective to distinguish *fact* from *opinion*. In *Harper* we recognized that an opinion is often " 'rhetorical hyperbole,' " which cannot reasonably be interpreted as stating actual facts. *Harper*, 77 Ohio St.3d at 229, 673 N.E.2d 1253, quoting *Greenbelt Coop. Publishing Assn., Inc. v. Bresler* (1970), 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6.

{¶ 40} I believe that a *false statement* of opinion connotes a deceitfulness that is absent in hyperbole. Accordingly, a distinction must be drawn between statements that may be reasonably interpreted by the ordinary reader as stating actual facts about an individual versus statements that can reasonably be interpreted by the reader as a free expression of an opinion only of the author. See *Harper*, 77 Ohio St.3d at 229, 673 N.E.2d 1253; *McKimm*, 89 Ohio St.3d at 144, 729 N.E.2d 364. Stating that a *"false statement* of opinion" is protected by the Ohio Constitution precariously and unnecessarily blurs the line between a mere opinion, which is protected by the Ohio Constitution, and a false statement of fact, which is not always protected.

{¶ 41} Accordingly, I believe that the better approach is to state that the Ohio Constitution protects opinions, but not false statements of opinion. Otherwise, I concur with the majority.

PFEIFER, J., dissenting.

{¶ 42} In *Disciplinary Counsel v. Grimes* (1993), 66 Ohio St.3d 607, 614 N.E.2d 740, a case involving a lawyer who made an off-color reference about a judge to a newspaper reporter and a smart-aleck remark to another judge in court, I dissented from the majority's decision to impose a public reprimand. In *Grimes*, I wrote that the conduct at issue was out of character and inconsequential, but also that "[o]ur legal system relies upon vigorous advocacy, which occasionally leads to spirited interplay between lawyers and judges" and that we "ought not rule in a way that may affect that friction." 66 Ohio St.3d at 610, 614 N.E.2d 740.

{¶ 43} I feel much the same way about the respondent in this case. By all accounts, his behavior was out of character. Certainly, a motion for reconsideration in an appellate court, while a public document, would receive about as much

scrutiny from the public if it were written on the wind. The offending statements were between this attorney and the bench, and were presented in such a way that only the bench and opposing counsel would see them.

{¶ 44} That being said, the disturbing thing about this case that separates it from *Grimes* is that the comments here were not made off-the-cuff in a moment of anger. They were written down, edited, and presumably checked for spelling. The attorney then made copies and filed his motion with the court. At any time he could have thought better of his comments and retracted them. It is a tried and true practice that the first thing a lawyer should do with a fiery pleading or letter is to file it under his or her pillow.

{¶ 45} The respondent here did not do that, or if he did sleep on it, made a mistake in filing it with the court. He admits as much, and thinks he deserves a public reprimand. I agree, especially given the virtually nonpublic release of his comments.

———

Jonathan E. Coughlan, Disciplinary Counsel, for relator.

James A. Vollins, for respondent.