DISCIPLINARY COUNSEL *v*. GAUL.

[Cite as *Disciplinary Counsel v. Gaul*, 127 Ohio St.3d 16, 2010-Ohio-4831.]

*Attorneys at law — Violations of former Code of Judicial Conduct and Rules of Professional Conduct — Six-month suspension stayed upon condition.*

(No. 2010-0062 — Submitted April 20, 2010 — Decided October 7, 2010.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 09-006.

_____

**Per Curiam**.

{¶ 1} Respondent, Daniel Gaul of Cleveland, Ohio, Attorney Registration No. 0009721, was admitted to the practice of law in Ohio in 1981. He has served as a judge on the Court of Common Pleas of Cuyahoga County since 1991.

{¶ 2} Relator, Disciplinary Counsel, charged respondent with violating Canons 2, 3(B)(5), and 3(B)(9) of the former Code of Judicial Conduct[1] and Prof.Cond.R. 8.4(d).

{¶ 3} A panel of the Board of Commissioners on Grievances and Discipline heard the case, issued findings of fact, and concluded that respondent violated the canons and rule as charged. The panel recommended a sanction of a public reprimand. The board adopted the panel's findings of fact and conclusions of law but amended the recommended sanction to a one-year suspension from the practice of law, with the entire year stayed. We accept the board's findings and

---

1. A revised version of the Code of Judicial Conduct became effective on March 1, 2009. The relevant conduct in this matter occurred prior to that date; all references to the Code are to the version in effect before the 2009 revision.

conclusions, but we amend the sanction to a six-month suspension from the practice of law, with all six months stayed.

**Facts**

{¶ 4} The charges in the complaint arise from respondent's conduct in a single criminal trial. The defendant in the case was accused of burglary and of assaulting an 83-year-old woman and her caregiver. In the first two days of the defendant's trial, preliminary matters such as witness availability and plea bargains were discussed, and the prosecution commenced and concluded its portion of voir dire. On the third day of trial, November 29, 2007, respondent was informed that the detective who was to transport the victims to court that morning had been unable to locate them when he went to pick them up.

{¶ 5} The news that the victims had not been found made respondent suspicious; he had previously begun to suspect that the defendant in the case might be trying to prevent the elderly woman from testifying. He stated that he had learned that the caregiver had admitted after the assault and burglary that she had a personal relationship with the defendant and that she had been smoking crack with him on the day that the crimes were committed. This fact, and the fact that the women were not at the house at the confirmed pickup time, caused respondent to worry for the elderly woman's safety.

{¶ 6} Respondent's concern was also based on a review of the dockets from the defendant's past criminal cases. He noted that a previous complaint against the defendant had been dismissed when the witnesses did not appear to testify and that bench warrants had to be issued for the witnesses in another case, although he could not be sure that the defendant had prevented the witnesses from testifying in those past cases.

{¶ 7} Respondent placed his concerns for the witness on the record:

{¶ 8} "This is not an 83 year old woman who can just go somewhere on her own. And given the fact that the alleged victim in this case [the caregiver] is a

drug abuser and has had a relationship with this defendant, I am very suspicion [sic].

{¶ 9} "I mean, this isn't a case that has to be researched. It's just a case of common sense and Psychology 101, and I am concerned [the caregiver] may be trying to manipulate this trial and prevent this 83 year old woman from being here, and I will not permit that to happen under any circumstances whatsoever."

{¶ 10} Respondent explained that he was making a record so that the relationships between the defendant and the witnesses would be understood if the case was appealed. He promised to allow the defense to make an objection when he was finished and then stated that he would grant a mistrial and arrest the caregiver if the witnesses did not appear the next day.

{¶ 11} Respondent continued: "If there is anybody involved in this case who was involved in what is obstruction of justice, I will see to it that case will be indicted. And if that case comes to me, I will see to it that person gets maximum consecutive time. I let no one manipulate the system of justice. I will not permit that to occur in this case."

{¶ 12} The state asked for a one-day continuance to locate the witnesses. The court granted the motion and ordered that the trial reconvene the next morning. Respondent also issued a bench warrant for the caregiver.

{¶ 13} The next morning, November 30, 2007, at the time the trial was to resume, respondent met with the attorneys in chambers. Respondent was informed that the detective had again been unable to find the women and that the state wanted to dismiss the case without prejudice. The defense counsel testified at the disciplinary hearing that respondent was irate that the prosecution wanted to dismiss the case; respondent indicated that he wanted to find a way out of the situation, and then respondent addressed the prosecutor, saying, "[W]e are all on the same team." The defense counsel testified that although he was present in the room, he did not take part in that conversation, that the comment was directed to

the prosecutors, and that he could not imagine a situation in which he would be on the same side as a judge during a proceeding. Respondent then informed the parties that he was intending to recuse himself when he took the bench.

{¶ 14} In order to locate the 83-year old witness, respondent told his bailiff that he was issuing an Amber Alert, which is an emergency-alert program designed to locate abducted children by coordinating efforts between law enforcement and the media. Respondent asked the bailiff to inform the media of the Amber Alert, and members of the local media came to respondent's courtroom. Respondent intended to saturate the local area with information to gain the help of the public in locating the witnesses.

{¶ 15} However, before going on the record, respondent was notified that the elderly woman had been located. The detective who had been looking for the witnesses had contacted the dialysis center where he knew the older woman was scheduled to be on Fridays after he had heard that respondent thought that she had been kidnapped. The dialysis center informed the detective that the woman had been at the dialysis center that morning but had since left.

{¶ 16} With the media who responded to the Amber Alert present, respondent went on the record: "I've called my friends in the media, and I've asked them to be here because I thought we were going to need their help, and I still do think we need their help to find witnesses in this case."

{¶ 17} Respondent continued: "I want to make a record, because it's very important in this case. * * *

{¶ 18} "The victim in this case — one of the victims in this case is * * * [name of the elderly victim]. I don't know her. I haven't met her. I don't know where she lives, but I do know that she's 83 years old and allegedly had her hip broken by this defendant.

{¶ 19} "THE DEFENDANT: She didn't have her hip broken by me.

{¶ 20} "THE COURT: I'm going to tell you something right now. I'm not here to hear from you, and if you make one more comment to me, I'm going to have you bound and gagged."

{¶ 21} Respondent outlined the basic facts of the case and explained that the caregiver said that she had been smoking crack and drinking with the defendant when a fight broke out over money and the defendant assaulted the two women. Respondent declared, "This defendant is presumed innocent," and he described the progress of the trial to that point, including the failure of the women to appear. Respondent explained that he had continued the trial the day before without impaneling a jury so that jeopardy would not attach.

{¶ 22} Respondent continued, "[A]s of 9:30 this morning as we prepared to try this case, we did not have witnesses, and we have some very tough decisions to make. Because if this case was dismissed after we impanel the jury, we cannot retry the defendant.

{¶ 23} "But perhaps more importantly, if this case was dismissed, [the defendant] has to be returned to our community and I am not prepared to do that at this time, because we have issues as to the care and protection of the 83 year old woman. And as of 9:30 this morning, we have no idea where she is.

{¶ 24} "Now we have learned within the last 45 minutes that [the elderly victim] is today in dialysis, but we still cannot find [the caregiver]. [The caregiver] is a most crucial witness in this case.

{¶ 25} "And I have to step out of my role now as being a fair and impartial Judge and indicate that I have become an advocate in this case, an advocate for justice. Because justice may be blind, but just has a heart, and it has a soul, and it has common sense.

{¶ 26} "And I would bet my life on the fact that you, sir, have been involved in obstruction of justice –

{¶ 27} "[DEFENSE ATTORNEY]: Objection, your Honor.

**{¶ 28}** "THE COURT: — through [the caregiver].

**{¶ 29}** "[DEFENSE ATTORNEY]: Objection, your Honor.

**{¶ 30}** "THE COURT: Okay. And I also would bet my life, if I had to right now, that you have been involved in a technical kidnapping through [the caregiver].

**{¶ 31}** "[DEFENSE ATTORNEY]: Objection, your Honor.

**{¶ 32}** "THE COURT: That's what I would bet.

**{¶ 33}** "[DEFENSE ATTORNEY]: Objection, your Honor.

**{¶ 34}** "THE COURT: You may object. You may object. That is this Court's finding, okay. It's not binding. And I'm going to recuse myself from this case, because obviously I cannot be fair and impartial anymore, okay.

**{¶ 35}** "But I felt it important to step out of my role as a Judge and to become an advocate to protect the well-being of an 83 year old woman who has no one else in this world.

**{¶ 36}** "And if nothing else, even if he's not convicted, we'll know this. We'll know where [the elderly victim] is, and she will be in safekeeping, because she's no longer going to be provided care by [the caregiver], your friend who was smoking crack with you. She's not going to be in that household. Because [the caregiver] is going to be in the county jail and she's going to sit in the county jail until this case is tried.

**{¶ 37}** "What's more important than me stepping off this case is that justice is done. There are 33 other wonderful Judges in this building that are willing to try you, and when you go to trial, I won't be surprised if you face obstructions of kidnapping [sic]."

**{¶ 38}** Respondent recognized the prosecutor, who stated that while he did not feel that the respondent had to recuse himself, he would understand if respondent did declare a mistrial. Respondent then asked if the state would like to

6

move to continue the case until the caretaker had been incarcerated; the state indicated that it would.

{¶ 39} The defense attorney objected to the continuance because earlier that morning, the prosecution had been willing to dismiss the case. The defense attorney argued that the prosecution had other witnesses and that the defendant's constitutional right to a speedy trial would be violated if the trial did not move forward.

{¶ 40} Respondent then responded by saying: "All right. Thanks * * *, I appreciate that.

{¶ 41} "You know, what is paramount, even more important than a speedy trial, even more important than the effective administration of justice, what's even more important is the integrity of the system. And there are so many unusual circumstances that have occurred during this case, including the role I had to take on to address this issue."

{¶ 42} Respondent explained that he was going to recuse himself and that the defendant would stay in jail. Then respondent challenged "the law enforcement of the community and of the City of Cleveland, and in Cuyahoga County and in the State of Ohio to find [the caregiver] and have her incarcerated" to determine "whether this defendant was involved in the disappearance of this 83 year old woman yesterday." Respondent added, "And I suspect when all said is done, that's exactly what they are going to find out, because I have [the defendant's] rap sheet right here."

{¶ 43} The defense attorney then moved to dismiss the case with prejudice. Respondent denied the motion and declared a mistrial with respect to the jury members who had been selected. He repeated his intention to recuse himself.

{¶ 44} Respondent returned to his chambers with members of the media and, in response to a question, stated: "[S]ometimes you get checked into the

boards and sometimes you gotta check somebody else into the boards, but I'm not going to sit idly by and dismiss this case. If I dismiss this case, [the defendant] wins and he could be out on the streets of our community tonight. He could be at this elderly woman's house again, smoking crack again. And that's not going to happen on my watch."

{¶ 45} Eventually, the defendant pleaded guilty to one count of felonious assault before a different judge and received a sentence of two years in prison.

### Violations of the Code of Judicial Conduct and Rules of Professional Conduct

{¶ 46} The board found that the actions taken by respondent in this case violated former Canons 2, 3(B)(5), and 3(B)(9) of the Code of Judicial Conduct and Prof.Cond.R. 8.4(d). Respondent filed objections to the board's final report. Two of the objections are general evidentiary issues and will be addressed before discussion of each violation and the related objection.

{¶ 47} Prior to the disciplinary hearing, the panel issued a pretrial order refusing to allow several witnesses to testify as experts on behalf of respondent. Respondent proposed to have the witnesses interpret the Code of Judicial Conduct and give their opinion whether respondent had violated the code in this case. At the hearing, the panel again refused to allow these witnesses to testify as experts, and respondent proffered the testimony.

{¶ 48} Respondent objected to the panel's decision not to admit the testimony from these witnesses on the ground that the decision denied him a fair hearing. Respondent argued that numerous courts in the United States have admitted expert testimony in disciplinary hearings against judges and lawyers.

{¶ 49} We review a decision on the admission of expert testimony under an abuse-of-discretion standard. See *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105. Citing Evid.R. 702, the panel found that the expert testimony would not have provided information that was beyond the panel's

understanding and knowledge of the Code of Judicial Conduct. In *Disciplinary Counsel v. Karto* (2002), 94 Ohio St.3d 109, 113, 760 N.E.2d 412, we held that expert testimony was properly excluded because the panel was qualified to determine whether a judge had abused his contempt power. In this case, it was not an abuse of discretion to exclude the expert testimony, because the panel was capable of interpreting and applying the Code of Judicial Conduct without an expert's opinion.

{¶ 50} In the pretrial order, the panel also refused to admit transcripts of jailhouse telephone conversations between the defendant and the caregiver. The transcripts were proffered into evidence at the disciplinary hearing. The panel refused to admit the transcripts on the ground that they were irrelevant to the charges against respondent.

{¶ 51} Respondent objects to the exclusion of these recordings. He argues that the exclusion of the transcripts deprived him of a fair hearing because it did not allow him to introduce all relevant evidence of the context in which he made his decisions. This objection has no merit, because respondent was not even aware that the jailhouse recordings existed at the time of the trial. The panel did not abuse its discretion by excluding this irrelevant evidence.

*Violations of Canon 2 of the Code of Judicial Conduct*

{¶ 52} Former Canon 2 of the Code of Judicial Conduct states, "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." 103 Ohio St.3d XCVII. The commentary to this section indicates that "[a]ctual improprieties under this standard include violations of law, court rules or other specific provisions of this Code."

{¶ 53} The board found that respondent violated Canon 2 of the Code of Judicial Conduct by making factual findings that the defendant had obstructed justice or committed a kidnapping when those findings were not based on

evidence before respondent. He announced on the record that he would "bet his life" that the defendant had committed one of these crimes. The board concluded that respondent's comments about the case and the defendant, both on and off the record, did not promote confidence in his integrity and impartiality. The board found that respondent also violated Canon 2 by misusing the Amber Alert system and the media's responsiveness to it.

{¶ 54} Respondent objects to the finding that he violated Canon 2. He argues that he had a legally sufficient basis for drawing the conclusion that the defendant had kept the victims from appearing and that the elderly victim was in danger. Therefore, he was justified in not holding a hearing before declaring a mistrial sua sponte, issuing a bench warrant to enforce a subpoena, and recusing himself from the case.

{¶ 55} Although respondent may have appropriately recused himself due to his suspicions about the defendant, his recusal did not excuse the highly prejudicial and unnecessary comments he directed toward the defendant both before and after the recusal decision. Respondent did not have any evidence before him or hold a hearing before announcing his judicial findings on the record. Respondent found that the defendant had caused the mistrial by preventing the witnesses from appearing merely on suspicion. As he later testified, he didn't know "if it would have been possible to prove [any misconduct] by clear and convincing evidence or beyond a reasonable doubt." A finding of fact must be based on evidence; to find that contemptuous conduct has occurred outside the presence of the court, the court must hold a hearing and analyze record evidence. See, e.g., *State v. Local Union 5760, United Steelworkers of Am.* (1961), 172 Ohio St.75, 79, 15 O.O.2d 133, 173 N.E.2d 331 (before making a finding of indirect contempt, hearing and notice are required).

{¶ 56} In *Disciplinary Counsel v. Medley*, 104 Ohio St.3d 251, 2004-Ohio-6402, 819 N.E.2d 273, we sanctioned a judge for deciding the merits of

legal issues without first hearing from both parties. In this case, respondent considered no evidence. Although respondent wanted to make a stand against what he perceived as witness intimidation, he could not "blatantly disregard procedural rules simply to accomplish what he * * * unilaterally consider[ed] to be a speedier or more efficient administration of justice." Id. at ¶ 42.

{¶ 57} Respondent also objects on the ground that he could not have violated Canon 2 for improperly issuing an Amber Alert because the Amber Alert was never officially issued. Although respondent is correct that an Amber Alert was never officially issued because he did not have the authority to do so, he did have his bailiff contact the media to tell them he was issuing such an alert. Respondent admits that he had thought that issuing an Amber Alert might not have been appropriate in this case, but he testified that it "[d]idn't make any difference." His misuse of the name of the service, in his judicial role, to attract media attention eroded public confidence in the integrity and impartiality of the judiciary and thus violated Canon 2. In *Disciplinary Counsel v. Hoague* (2000), 88 Ohio St.3d 321, 323, 725 N.E.2d 1108, we found a violation of Canon 2 when a judge sent improper and intimidating letters on court letterhead to force individuals to appear before him on matters not before the court to achieve "his personal goal of reprimanding persons he believed were guilty of reckless driving." Here, respondent used the Amber Alert system in a similar improper fashion by having his bailiff contact the media to achieve his goal of gaining media attention, despite knowing that he probably did not have the authority to issue that alert.

*Violations of Canon 3(B)(5) of the Code of Judicial Conduct*

{¶ 58} Canon 3(B)(5) of the former Code of Judicial Conduct states, "A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice * * * ." 78 Ohio St.3d CLXXIII. We have defined bias or prejudice in the

judicial context as behavior that " 'implies a hostile feeling or spirit of ill will or undue friendship or favoritism towards one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.' " *Cleveland Bar Assn. v. Cleary* (2001), 93 Ohio St.3d 191, 201, 754 N.E.2d 235, quoting *State ex rel. Pratt v. Weygandt* (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, paragraph four of the syllabus.

{¶ 59} The board found that respondent's conduct violated Canon 3(B)(5) because he exhibited clear prejudice against the defendant during the proceedings. He manifested that bias in his speech, accusing the defendant of unproven acts such as obstruction of justice, kidnapping, and smoking crack. He also threatened to have the defendant bound and gagged, proclaimed that he was on the "same team" with the prosecution in the matter, and explained his behavior by saying that "sometimes you got to check somebody else into the boards."

{¶ 60} The board also found that respondent manifested his bias in his conduct, denying the defendant's motion to dismiss with prejudice *after* he had announced to the media-filled courtroom that he was no longer able to act as a fair and impartial judge, that he was acting as an advocate, and that he was recusing himself.

{¶ 61} Respondent's bias was apparent when he told the media that he would not dismiss the case because the defendant then "wins." His bias was further confirmed at the disciplinary hearing when he testified that he viewed his actions as confronting the defendant's "evil."

{¶ 62} Respondent argues that his words and conduct merely supported his decision to declare a mistrial and to recuse himself; thus, they did not manifest bias, because every judicial decision is naturally in favor of one party and against another. This argument passes over the fact that respondent's words and conduct manifested a hostile feeling and a spirit of ill will and that he continued to rule on

12

defense counsel's motion to dismiss the case even after he had admittedly stepped out of his role as a fair and impartial judge.

{¶ 63} Respondent next argues that the impermissible bias or prejudice in Canon 3(B)(5) is limited to the extrajudicial sources listed in the Canon, such as race, gender, and religion. Canon 3(B)(5) states that impermissible judicial bias includes but *is not limited to* these listed sources of bias. We have rejected the argument that bias must be rooted in a listed extrajudicial source to constitute a violation of Canon 3(B)(5). See *Cleary,* 93 Ohio St.3d at 202, 754 N.E.2d 235. Regardless of the source of the bias, respondent impermissibly acted in a way that implied a "hostile feeling or spirit of ill-will" toward the defendant, instead of approaching the matter with an "open state of mind which will be governed by the law and the facts." See id. at 201.

*Violations of Canon 3(B)(9) of the Code of Judicial Conduct*

{¶ 64} Former Canon 3(B)(9) states, "While a proceeding is pending or impending in any court, a judge shall not make any public comment that might reasonably be expected to affect its outcome or impair its fairness * * *." 78 Ohio St.3d CLXXIV. However, judges are not prohibited "from making public statements in the course of their official duties or from explaining for public information the procedures of the court."

{¶ 65} The board found that respondent violated Canon 3(B)(9) when he made statements accusing the defendant of unproven misconduct and when he told the defendant that he would personally see to it that anyone involved in obstruction of justice would be indicted, convicted, and given the maximum sentence. The board found that these statements could reasonably be expected to impair the fairness of any future proceedings.

{¶ 66} Respondent objects to the conclusion that he violated Canon 3(B)(9), arguing that he made many of his comments in the course of his official duties while on the bench and that the discussion in chambers with the media was

13

merely designed to explain court procedures. However, the exception in Canon 3(B)(9) clarifies that it does not prohibit all public comments but only those public comments that reasonably can be expected to affect the outcome or impair the fairness of proceedings. Respondent's statements that he was checking the defendant "into the boards" and that he would not let the defendant out of jail to go smoke crack again were adversarial in nature, not a description of court procedure. Therefore, respondent's public comments could reasonably be expected to impact the fairness of the defendant's continuing case.

{¶ 67} Respondent also objects to the conclusion that he violated Canon 3(B)(9) on the ground that no evidence was presented that a reasonable judge would have found that the defendant's expectation of a fair trial was violated. The standard found in Canon 3(B)(9) is one of an objective expectation. When analyzing Canon 2, we have found that it is unnecessary for Disciplinary Counsel to submit public-opinion polls to show that the public's confidence in the judiciary was actually undermined by a judge's behavior. See *In re Complaint Against Harper* (1996), 77 Ohio St.3d 211, 217, 673 N.E.2d 1253. Likewise, there is no need here to submit evidence that other jurists would have found that respondent's actions violated a defendant's expectation of a fair trial to prove a violation of Canon 3(B)(9). The panel heard sufficient evidence to determine that respondent's actions "might reasonably be expected to affect" the outcome or fairness of the proceedings against the defendant.

*Violations of Prof.Cond.R. 8.4(d)*

{¶ 68} Prof.Cond.R. 8.4(d) states "[I]t is professional misconduct for a lawyer to * * * engage in conduct that is prejudicial to the administration of justice." We have interpreted the phrase "conduct that is prejudicial to the administration of justice," when disciplining a judge, to be "conduct that would appear to an objective observer to be unjudicial and prejudicial to the public esteem for the judicial office." *Cleary*, 93 Ohio St.3d at 206, 754 N.E.2d 235

(interpreting DR 1-102(A)(5), Prof.Cond.R. 8.4(d)'s predecessor). A demonstrated bias on the part of a judge, and the failure to show the integrity and independence of the judiciary, will result in violations of Prof.Cond.R. 8.4(d). See *Disciplinary Counsel v. Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, ¶ 12, 36.

{¶ 69} The board concluded that respondent's on-the-record treatment of the defendant was both unjudicial and prejudicial to the esteem for the office. Based primarily on the conduct discussed in the sections concerning respondent's violations of the Code of Judicial Conduct, the treatment of the defendant was found to be unfair, to demonstrate a bias on the part of respondent, and to undermine the integrity and independence of the judiciary.

{¶ 70} Respondent objects to the finding that he violated Prof.Cond.R. 8.4(d) and argues that his actions furthered, instead of prejudiced, the administration of justice. For instance, respondent argues that when he said he would see to it that anyone who obstructed justice would be indicted and convicted and would receive a maximum sentence, he was merely discussing his judicial philosophy and sending a strong statement against witness intimidation. Respondent did not simply articulate his judicial philosophy. He promised to take actions that would have been unethical for him to take: respondent later admitted that he could not have presided over the case had he been involved in procuring the indictment, because he would have been a witness against the defendant. These comments did not enhance the administration of justice; his blurring of the judicial role and his lack of neutrality were prejudicial to the administration of justice.

{¶ 71} Respondent also argues that he was justified in putting his findings that the defendant had obstructed justice or kidnapped the witnesses on the record before recusing himself. As we noted in the discussion of the violation of Canon 3(B)(5) of the Code of Judicial Conduct, the comments made by respondent went

far beyond those necessary for recusal. The recusal itself was not inappropriate, but the comments made throughout the trial made respondent appear to be biased and prejudiced against the defendant.

{¶ 72} Finally, respondent argues that disciplining him for taking decisive action against obstruction of justice would be irresponsible because a judge should be able to protect witnesses. He quotes *State v. Busch* (1996), 76 Ohio St.3d 613, 615-616, 669 N.E.2d 1125, making the argument that "[t]rial courts deserve the discretion to be able to craft a solution that works in a given case." Unlike the trial judge in *Busch*, however, respondent did not act based upon evidence before him. Instead, respondent acted on emotion, or what he termed "common sense and Psychology 101," rather than on evidence and careful deliberation. Our decision does not prevent judges from protecting witnesses, but it does require a judge to do so while acting impartially and within the rule of law.

{¶ 73} Therefore, we adopt the board's conclusions and find that respondent committed the violations as charged.

**Sanction**

{¶ 74} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer has violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21. Because each disciplinary case is unique, we are not limited to the factors specified in the rule but may take into account "all relevant factors" in determining what sanction to impose. BCGD Proc.Reg. 10(B).

{¶ 75} The board found that the factors mitigating respondent's conduct included the lack of a prior disciplinary record, BCGD Proc.Reg. (10)(B)(2)(a), an absence of a dishonest or selfish motive, (10)(B)(2)(b), his full and free disclosure to the disciplinary board, (10)(B)(2)(d), and respondent's good character and reputation, (10)(B)(2)(e). Additionally, the board found that the defendant suffered no actual prejudice, because the plea bargain he had accepted was more favorable to him than the offer he had received while the case was in front of respondent. The board found that the factors in aggravation included respondent's refusal to acknowledge any misconduct and his attempt to portray himself as a victim of persecution by the Office of Disciplinary Counsel because he had previously criticized that office.

{¶ 76} The panel recommended a sanction of a public reprimand after considering all the aggravating and mitigating factors. The board, troubled by respondent's inability to carry out his duty to decide a matter based on properly admitted evidence in a fair and impartial manner and his refusal to acknowledge his misconduct, recommended that he be suspended from the practice of law for one year with the entire year stayed.

{¶ 77} We do not adopt either of the proposed sanctions and instead impose a six-month suspension, with all six months stayed. Like the judge who received a six-month stayed suspension for a single violation of former Canon 2 of the Code of Judicial Conduct in *Disciplinary Counsel v. Hoague*, 88 Ohio St.3d 321, 725 N.E.2d 1108, respondent's misconduct was isolated. Respondent may have felt strongly about the defendant's supposed violations of law. As in *Hoague*, however, a judge is not excused from complying with the judicial canons. In *Disciplinary Counsel v. Ferreri* (1999), 85 Ohio St.3d 649, 710 N.E.2d 1107, we imposed an 18-month suspension, with 12 months stayed, but the stricter sanction imposed in *Ferreri* need not be imposed here. The judge in *Ferreri* clearly intended to influence public opinion. In comparison, the board in

this matter found that respondent truly believed that he was protecting the integrity of the criminal justice system.

{¶ 78} Respondent objected to the board's recommended sanction as well as the weight and consideration the board gave to mitigating factors. He claims that the board did not give proper consideration to his belief that Article I, Section 10a of the Ohio Constitution, which provides that victims of criminal offenses shall be accorded fairness, dignity, and respect, required him to consider the safety of the witnesses. He argues that the language in the Preamble to the Code of Judicial Conduct makes this a case in which discipline is not appropriate, or in which a public reprimand is the strictest sanction warranted, because he acted with good faith and preserved the integrity of the judicial proceedings. The Preamble states, "It is not intended, however, that every transgression will result in disciplinary action" and that factors such "as the seriousness of the transgression, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system" and the protection of the public should determine whether discipline is appropriate.

{¶ 79} We have already concluded that respondent's actions did not further the integrity of the judicial proceedings. Although judges should protect witnesses, they must do so within the law and the ethical rules. Respondent's argument that he had a good motive for his actions in wanting to protect the witnesses from harm has been rejected in past cases. "[S]trong feelings do not excuse a judge from complying with the judicial canons and the Disciplinary Rules." *Ferreri*, 85 Ohio St.3d at 654, 710 N.E.2d 1107. Therefore, despite his strong feelings and the motivation respondent claims for his actions, this case is one that warrants discipline.

## Conclusion

{¶ 80} Respondent is therefore suspended from the practice of law in Ohio for six months; however, the suspension is stayed on the condition that he

commit no further misconduct during the stayed suspension period. If respondent violates this condition, the stay will be lifted, and respondent will serve the six-month suspension. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, LUNDBERG STRATTON, O'DONNELL, and CUPP, JJ., concur.

O'CONNOR and LANZINGER, JJ., dissent and would suspend respondent from the practice of law in Ohio for one year, all stayed.

BROWN, C.J., not participating.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Senior Assistant Disciplinary Counsel, for relator.

Richard C. Alkire Co., L.P.A., Richard C. Alkire, and Dean Nieding, for respondent.

_____